1

2

3

4

5

6

7

8          **UNITED STATES DISTRICT COURT**

9          **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  JANET WOOD, individually and on behalf of all others similarly situated, | CASE NO. 03cv1910-MMA(WMc) |
| 12 | |
| 13                          Plaintiff, | |
| 14          vs. | **ORDER GRANTING DEFENDANT CITY OF SAN DIEGO'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT, OR** |
| 15 | **AMENDED COMPLAINT, OR ALTERNATIVELY, FOR SUMMARY** |
| 16 | **JUDGMENT DUE TO LACK OF ARTICLE III STANDING** |
| 17  THE CITY OF SAN DIEGO; and DOES 1 through 20, inclusive, | [Doc. No. 149] |
| 18                          Defendants. | |
| 19 | |

20          This matter is before the Court on three pending motions: (1) Defendant City of San Diego's

21   motion to dismiss Plaintiff Janet Wood's First Amended Complaint, or in the alternative for partial

22   summary judgment, due to lack of Article III standing [Doc. No. 149]; (2) Defendant City of San

23   Diego's motion for summary judgment regarding the business necessity defense to Plaintiff's federal

24   discrimination claim [Doc. No. 150]; and, (3) Plaintiff's motion for partial summary judgment [Doc.

25   No. 147].  Prior to the October 28, 2010 hearing on these motions, the Court issued notice to the

26   parties of its tentative decision to grant the City's motion to dismiss Plaintiff's First Amended

27   Complaint due to lack of constitutional standing to bring her federal discrimination claim [Doc. No.

28   177].

1    Having reviewed the submissions of the parties and considered the oral arguments of

2    counsel, the Court **AFFIRMS** its tentative ruling and **GRANTS** the City's motion to dismiss.

3                                   <u>**FACTUAL BACKGROUND**</u>

4    Plaintiff Janet Wood ("Wood") began her employment with Defendant City of San Diego

5    ("the City") in 1972.  After leaving for a period between 1972 and 1974, Wood returned as a full-

6    time employee of the City in 1978.  After being employed by the City of San Diego for over 32

7    years, Wood retired in December 2005.

8    Employees of the City of San Diego participate in a defined benefit pension plan.  The plan

9    provides a lifetime retirement benefit.  Prior to his or her retirement date, an employee makes a

10   choice as to whether to leave a survivor benefit to a spouse or other named beneficiary to be paid

11   upon his or her death.  Thus, when the employee retires, he or she must choose one of five payment

12   options to calculate the employee's retirement benefit vis-a-vis any selected survivor benefit.  Each

13   of the available options allows the employee to designate a different percentage of their total benefit

14   for him or herself and the surviving spouse or beneficiary.  Wood was unmarried on the date she

15   "retired," i.e., entered into the optional Deferred Retirement Option Program ("DROP"),[1] and she

16   elected the "maximum benefit," or for purposes of this litigation, the "surviving spouse continuing

17   benefit" ("SSCB" hereafter).[2,3]  This option is referred to as the maximum benefit because it

18

19   [1] "DROP allows an employee to continue working beyond the age set for retirement and provides
20   an alternative form of pension benefit accrual under which an employee's final pension benefits under
     the defined benefit plan are determined and calculated as of the date the employee enters DROP. In lieu
     of having continued compensation and additional years of service taken into account for the defined
21   benefit plan, DROP members' pension benefits are deposited to a DROP account, to which each of the
     employee and City contributes a percentage of the employee's base salary. That DROP account earns
22   interest and is paid to the employee, in addition to its previously defined benefits, once the employee
     leaves City employment." *San Diego Police Officers' Ass'n v. San Diego City Emples. Ret. Sys.*, 568
23   F.3d 725, 732 (9th Cir. 2009).

24   [2] The SSCB was originally enacted on January 12, 1971, in Ordinance O-10479. The SSCB is
     now codified in San Diego Municipal Code Section 24.0601, which states in pertinent part: "Beginning
25   on July 1, 1973, every Member will make survivor contributions in addition to Normal Contributions.
     The System will calculate the survivor contributions as a percentage of Normal Contributions. . ."
26
     [3] In general, a spousal survivor benefit provides post-retirement survivor benefits to the pension
27   plan participant's current surviving spouse rather than to a designated beneficiary.  Because such
     survivor benefits are payable by virtue of the surviving spouse's status, no portion of these benefits can
28   be assigned to an alternate payee. However, a participant may have the option to select an alternative
     retirement option and designate a beneficiary if the participant is not married at the time of retirement.

1  provides the highest possible monthly allowance to the employee for his or her lifetime and

2  guarantees any eligible spouse a 50% automatic continuance after the employee dies for the rest of

3  the spouse's life.[4]

4      Unmarried employees who select the SSCB option may either receive a lump sum refund of

5  their surviving spouse contributions, those made in addition to the employee's normal contributions,

6  including interest, or have these contributions treated as voluntary additional contributions made to

7  provide a larger annuity benefit.[5] Wood chose the latter option, crediting to her DROP account a

8  refund of her survivor contributions on an annuitized basis.

9      According to Wood's theory of liability, the 50% automatic continuance to a married

10 retiree's surviving spouse is a benefit of far greater value than the "substitute" benefit provided to

11 unmarried retirees – a return of their surviving spouse contributions as a lump sum or additional

12 annuity. Because females retire from employment with the City unmarried at a higher percentage

13 rate than males, females receive the less valuable "substitute" benefit more frequently than their

14 male counterparts. In this respect, Wood asserts that the SSCB option creates a payout disparity that

15 has a disparate impact on female employees of the City in violation of state and federal employment

16 discrimination laws.

17     On September 19, 2003, Wood filed an administrative charge with the California Department

18 of Fair Employment and Housing alleging gender and marital discrimination in violation of

19 California's Fair Employment and Housing Act ("FEHA") arising out of the SSCB option, and the

20 payout disparity created by the option due to its differing treatment of married versus unmarried

21 retirees and the allegedly unlawful disparate impact it has on female retirees. Also on September 19,

22

23 [4] Section 24.0601(c) of the San Diego Municipal Code provides that "[w]hen a Member dies,
24 the System will pay the Member's surviving spouse a monthly allowance equal to 50% of the Member's
   monthly retirement allowance if: (1) the Member designated the spouse as Beneficiary; (2) the spouse
   was married to the Member on the date the Member retired, and (3) the Member's monthly retirement
25 allowance was the maximum monthly benefit, and was not modified under Optional Settlement 1, 2, 3,
   or 4."
26
27 [5] Section 24.0601(e) of the San Diego Municipal Code provides that "If, at the time of
   retirement, a Member who has selected the maximum benefit does not have a spouse who is eligible for
   benefits under this section, the System will either: (1) pay the Member the Accumulated Contributions
28 including interest he or she made pursuant to this section, in lump sum, or (2) treat these contributions
   as voluntary additional contributions made to provide a larger Annuity benefit."

1   2003, Wood submitted an Intake Questionnaire to the United States Equal Employment Opportunity

2   Commission alleging gender discrimination in violation of Title VII arising out of the SSCB.

3   ### PROCEDURAL BACKGROUND

4       On September 24, 2003, Wood, on behalf of herself and others similarly situated, filed this

5   action against the City alleging violations of Title VII and FEHA.  The City has contested the

6   sufficiency of Wood's allegations from the outset of this litigation.  The City's first challenge was a

7   motion for summary judgment filed on May 19, 2004, in which the City asserted that Wood failed to

8   adequately exhaust her administrative remedies prior to filing suit.  On January 10, 2005, then

9   presiding District Judge Roger T. Benitez *sua sponte* dismissed Wood's Title VII claim for lack of

10  Article III standing.

11      Wood appealed the dismissal of her claims, and her appeal remained pending before the

12  Ninth Circuit from February 2, 2005 until April 6, 2007.  The Ninth Circuit reversed Judge Benitez's

13  ruling in part, vacated it in part, and remanded the case for further proceedings.  As to Article III

14  standing, the Ninth Circuit reversed the ruling based on the failure by the district court to develop a

15  factual or legal record upon which to review the *sua sponte* determination.  The circuit court stated

16  in pertinent part:

17          On this record we are unable to accept the district court's reasons for concluding that
            Wood suffered no injury at all.  Wood is female, was unmarried at retirement, and
18          claims (among other things) that unmarried retirees, who are disproportionately
            female, are given back only their own contributions (plus interest) to the plan – either
19          as a lump sum or its actuarial equivalent in an annuity – but not the City's contribution.
            Also, there is evidence of a $1.5 million difference between benefits paid to married
20          and unmarried retiree households.  It may well be that Wood cannot actually prove
            non-speculative, gender-based injury, but we cannot say on this record that as a matter
21          of law she lacks standing to try.

22  The court reversed and remanded, concluding that "if the district court determines to pursue the

23  standing issue *sua sponte*, then it should afford both parties the opportunity to develop a factual and

24  legal record."  *Wood v. City of San Diego*, 239 Fed. Appx. 310, 311-12 (9th Cir. 2007).

25      With respect to exhaustion, the original ground upon which the City moved for dismissal, the

26  circuit court rejected the City's argument.  The court found that Wood's injury occurred and her

27  claim arose on the date she entered the DROP program (August 2, 2003).  Citing its holding in

28  *Casavantes v. Cal. State Univ., Sacramento*, 732 F.2d 1441, 1442 (9th Cir. 1984), the court further

1  found that her EEOC Intake Questionnaire, filed on September 18, 2003, qualified as a charging

2  document. As such, the Ninth Circuit held that Wood properly exhausted her administrative

3  remedies before filing suit and remanded the case to this Court for further proceedings consistent

4  with its ruling.

5      On January 14, 2008, the Court spread the Ninth Circuit's mandate. On June 2, 2008, the

6  City filed a renewed motion to dismiss, or in the alternative for summary judgment or partial

7  summary judgment.[6] The sole issue addressed in the City's renewed motion to dismiss was whether

8  the Court should deviate from the law of case as determined by the Ninth Circuit, and find that

9  intervening, controlling law required dismissal of Wood's Title VII claim for failure to properly

10  exhaust her administrative remedies. The Court found that it did not, denied the City's motion to

11  dismiss, and granted Plaintiff's contemporaneously filed motion for class certification.

12      On November 6, 2009, Wood filed a motion for leave to file a first amended complaint

13  ("FAC"). Wood sought leave to amend her complaint in three respects: (1) to add a prayer for

14  injunctive relief, (2) to add a new California state law claim for sex discrimination in violation of

15  Cal. Gov. Code § 12940(a), and (3) to expand her federal discrimination claim, previously asserted

16  on the single legal theory of disparate impact, to include a claim for disparate treatment. On January

17  4, 2010, the Court granted the motion. Wood filed her FAC on January 6, 2010. Thereafter, the

18  City filed a motion to dismiss the FAC, which the Court granted in part and denied in part. As to

19  Wood's federal discrimination claim, the Court found her allegations of disparate impact sufficient

20  to survive the motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).[7] As to

21  Wood's allegations of disparate treatment, the Court found that she failed to state a plausible claim

22  for relief. Because the Court allowed Wood's federal discrimination claim to go forward on a

23  disparate impact theory, the Court retained supplemental jurisdiction over her state law claims. The

24  Court further found that Wood should not be granted leave to further amend her pleadings based on

25

26      [6] Judge Benitez took the motion under submission on July 10, 2008. On November 17, 2008,
    Judge Benitez transferred the case to the undersigned.

27

28      [7] The City challenged Wood's disparate impact claim on the sole basis that the San Diego City
    Employees Retirement System qualifies as a bona fide seniority system, which is permitted as a matter
    of law under 42 U.S.C. § 2000e-2(h).

1  a balancing of the Rule 15(a) factors, and the FAC became the final, operative pleading in the case.

2        On August 2, 2010, the parties filed the currently pending dispositive motions.  As standing

3  is a jurisdictional requirement, the Court is obliged to consider the City's motion to dismiss due to

4  lack of Article III standing before reaching the merits of Plaintiff's summary judgment motion

5  regarding Title VII liability or the City's summary judgment motion regarding the business necessity

6  defense to liability.  *See, e.g., Mansfield, C.& L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884)

7  (citing *Capron v. Van Noorden*, 6 U.S. 126 (1804) for the proposition that a federal court must

8  resolve jurisdictional questions before considering a case's merits, and describing the requirement as

9  "springing from the nature and limits of the judicial power of the United States," and "inflexible and

10  without exception.").

11  **DISCUSSION**

12        The City moves to dismiss Wood's federal discrimination claim due to lack of standing

13  sufficient to state a case or controversy within the Court's subject matter jurisdiction.  On October

14  27, 2010, the Court issued notice to of its tentative ruling granting the City's motion, based on a

15  finding that Wood lacks standing under Article III of the United States Constitution because she has

16  not suffered an "injury in fact" that is neither "conjectural or hypothetical."  *Lujan v. Defenders of*

17  *Wildlife*, 504 U.S. 555, 560-561 (1992) (citations omitted).  Having considered the oral arguments of

18  counsel, and after careful review of the parties' submissions and applicable law, the Court affirms its

19  tentative ruling for the reasons stated below.

20        *1.*    *Legal Standard*

21            A)    Constitutional Standing

22        The standing inquiry serves to determine whether "a party has a sufficient stake in an

23  otherwise justiciable controversy to obtain judicial resolution of that controversy," *Sierra Club v.*

24  *Morton*, 405 U.S. 727, 731 (1972), and to ensure that legal questions will be resolved "in a concrete

25  factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley*

26  *Forge Christian Coll. v. Am. United for Separation of Church and State, Inc*., 454 U.S. 464, 472

27  (1982).  To ascertain whether the "case or controversy" requirement under Article III (U.S.

28  Const.art. III, § 2, P1) is satisfied, courts must resolve three issues:

1     (1) whether the plaintiff has suffered an "injury in fact" –  an invasion of a legally protected

2     interest which is (a) concrete and particularized, and (b) "actual or imminent, not

3     'conjectural' or 'hypothetical;'"

4     (2) whether there is a causal connection between the injury and the conduct complained of –

5     the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not...

6     the result [of] the independent action of some third party not before the court;" and,

7     (3) whether it is "likely," as opposed to merely "speculative," that the injury will be

8     "redressed by a favorable decision."

9     *Lujan*, 504 U.S. at 560-561(internal citations omitted).  The party invoking federal jurisdiction has

10    the burden of establishing the various elements of standing.  As "an indispensable part of the

11    plaintiff's case, each element must be supported in the same way as any other matter on which the

12    plaintiff bears the burden of proof."  *Id.* at 561.

13    Title VII allows "a person claiming to be aggrieved" by an unlawful employment practice to

14    sue.  42 U.S.C. § 2000e-5.  This language has been interpreted to define Title VII's statutory

15    standing broadly, thus it is not necessary to consider the more restrictive requirements of prudential

16    standing.  *See Waters v. Heublein, Inc.*, 547 F.2d 466, 469-70 (9th Cir. 1976) (noting broad Title VII

17    standing).  "In the class action context, Article III standing simply requires that the class

18    representatives satisfy standing individually."  *In re Verisign, Inc.*, 2005 U.S. Dist. LEXIS 10439,

19    2005 WL 88969, *4 (N.D. Cal. 2005).

20                    B)      Rule 12(b)(1)

21    Rule 12(b)(1) of the Federal Rules of Civil Procedure provides an avenue by which a party

22    may move to dismiss an action for lack of subject matter jurisdiction.  When considering a motion to

23    dismiss under Rule 12(b)(1), a court is not restricted to the face of the pleadings, but may review any

24    evidence to resolve factual issues relevant to the jurisdictional determination.  *McCarthy v. United*

25    *States*, 850 F.2d 558, 560 (9th Cir. 1988).  Consideration of material outside the pleadings does not

26    convert the motion into one for summary judgment.  *Biotics Research Corp. v. Heckler*, 710 F.2d

27    1375, 1379 (9th Cir. 1983).  Once challenged, the burden of establishing the existence of subject

28    matter jurisdiction rests on the party asserting jurisdiction.  *Thomson v. Gaskill*, 315 U.S. 442, 446

1  (1942).

2    A motion under Rule 12(b)(1) is appropriate when the jurisdictional issue is separable from

3  the merits of the case, i.e., jurisdiction and substantive facts are not intertwined.[8] *Roberts v.*

4  *Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987).  A Rule 12(b)(1) jurisdictional attack may be

5  facial or factual.  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  "In a facial attack, the

6  challenger asserts that the allegations contained in the complaint are insufficient on their face to

7  invoke federal jurisdiction."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

8  "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by

9  themselves, would otherwise involve federal jurisdiction… In such circumstances, a court may

10  examine extrinsic evidence without converting the motion to one for summary judgment, and there

11  is no presumption of the truthfulness of the [p]laintiff's allegations."  *Id.*; *see also Land v. Dollar*,

12  330 U.S. 731, 735 n.4 (1947) ("[W]hen a question of the District Court's jurisdiction is raised . . .

13  the court may inquire by affidavits or otherwise, into the facts as they exist.").

14    ***2.    Analysis***

15       A.    Injury In Fact

16         i.    *The Parties' Arguments*

17    The City first asserts that Wood has not suffered an injury in fact and therefore lacks

18  standing to pursue her federal discrimination claim.  Based on the established premise that pension

19  benefits are considered compensation and therefore subject to protection from discrimination under

20  Title VII, Wood alleges that she has suffered pecuniary injury capable of monetary valuation

21

22  [8] The City asserts a factual attack on Plaintiff's allegation of subject matter jurisdiction, and
23  argues that the Court can resolve this motion under the standards provided by Rule 12(b)(1).  However, the City asserts that if the Court determines that the substantive issues of this case are intertwined with the jurisdictional issue, then summary judgment standards apply.
24

25  To establish discrimination through disparate impact, a plaintiff must (1) identify a specific practice of the Defendant; (2) identify a significant discriminatory impact on the protected class of which the plaintiff is a member; and (3) demonstrate that the identified practice causes the identified
26  discriminatory impact.  *Paige v. California*, 291 F.3d 1141, 1144-45 (9th Cir. 2002).  Because the standing analysis concentrates on the plaintiff's individualized injury, it appears to this Court that the
27  Article III issue is not so intertwined with the merits of Wood's disparate impact claim that it requires analysis under the summary judgment standard.  The Court notes that there is a paucity of cases dealing
28  with this specific issue in the Title VII context, but those pointed out by the City hold that standing in an employment discrimination case can be determined under Rule 12(b)(1).

1    sufficient to demonstrate standing. *Manhart v. Los Angeles, Dep't of Water & Power*, 553 F.2d 581,

2    590 (9th Cir. 1976) (stating that "Congress gave a strong indication that it did intend to place sex

3    discrimination in pension and retirement plans, even when based on actuarially sound tables, within

4    the type of discrimination forbidden by Title VII."); *see also Sierra Club*, 405 U.S. at 737 (holding

5    that concrete economic injury is sufficient to establish injury in fact for standing purposes).

6           First, Wood asserts that she suffered economic injury on the date she entered DROP, as the

7    benefit she actually received based on her unmarried status was less valuable than the amount she

8    would have been eligible to receive if she had been married.  Second, Wood alleges she suffered

9    pecuniary injury by receiving a refund of only her employee contributions under San Diego

10   Municipal Code section 24.0601(e), whereas married retirees receive a benefit funded also by

11   "substantially equal" matching employer contributions.

12          As to both allegations, the City argues that Wood cannot make an individualized showing of

13   actual injury, and her attempts to do so are based on assumptions as to what benefit she *might* have

14   received *if* she had retired married, and the additional unknown variables of whether she would have

15   pre-deceased her spouse, whether her spouse would have lived long enough to receive benefits, and

16   whether the benefits received by her spouse would have had a value greater than that which she

17   received on the date of her retirement.  In essence, the City argues that Wood did not suffer an actual

18   injury, and that any economic injury she hypothesizes to arise out of her unmarried status is purely

19   speculative.

20          In order to establish that she personally suffered an economic injury, Wood primarily relies

21   on the testimony of Manuel Valdez, manager of the San Diego office of Ringler Associates, the

22   "oldest and largest" provider of annuities in the United States.  In an effort to articulate the disparity

23   in benefits created by the SSCB, he approached the issue from a cost-based perspective and prepared

24   estimates of the cost of an annuity for a 55 year old female beginning to withdraw a lifetime monthly

25   annuity equal to that which Wood receives, payable under two scenarios based on whether she

26   retired married or unmarried.  In the first scenario, he assumed the annuitant was married at

27   retirement, with a husband four years her elder, and eligible for a 50% benefit if her husband

28   survives her as the primary annuitant.  Valdez estimated the cost to fund this annuity at $1,909,091.

1  The second scenario is based on the annuitant retiring unmarried.  The cost of the annuity in the

2  second scenario is less at $1,820,582.  The difference between the two scenarios is $88,509.

3  Equating the cost of providing a benefit with the value of the benefit itself, Wood suggests the

4  Valdez analysis provides a reasonable estimation of her economic injury because it shows the

5  disparate cost between insuring a married versus unmarried retiree.

6        The City objects to the Valdez testimony on multiple grounds, including arguing discovery

7  rules violations because Wood allegedly did not notice Valdez as an expert witness in accordance

8  with the scheduling order.  Assuming that the Valdez testimony may be considered despite any

9  issues of untimely disclosure, the City argues that the underlying premise of Valdez's calculations is

10  faulty.  The City asserts that a cost disparity to the provider of an annuity, whether it be a

11  hypothetical insurer, as in the Valdez scenario, or an employer, such as the City, does not establish a

12  payout disparity to the employee, because cost and benefit do not bear a direct relation.

13        The City also contends that the Valdez testimony is irrelevant under Federal Rules of

14  Evidence 401 and 402 because it relies upon the costing of life insurance annuities based upon

15  assumed facts not in evidence.  The City argues that Valdez's calculation of Wood's supposed

16  economic injury is based on a set of unsupported, speculative, and hypothetical assumptions

17  irrelevant to Wood's actual situation.  Valdez assumed "normal life expectancies" for the annuitant

18  and her imaginary husband, he assumes the imaginary husband survives the wife, he assumes the

19  imaginary husband is four years older than the annuitant, and he assumes a 2% cost of living

20  adjustment.  All of these assumptions, argues the City, are factual assumptions that are not supported

21  by the evidence relevant to Wood and are thus insufficient to establish actual injury.  The City avers

22  that because Wood seeks to establish her injury based on the cost of a hypothetical continuance

23  benefit for a hypothetical surviving husband that can be annuitized using hypothetical facts, she has

24  not made the actual, non-speculative showing of injury in fact required in order to have

25  constitutional standing.

26              ii.    *Analysis*

27        As noted above, a plaintiff's injury must be real and concrete, not conjectural or

28  hypothetical.  *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974).  The Court finds that Wood does not

1  satisfy this standard and therefore lacks constitutional standing to pursue her federal discrimination

2  claim.

3                                      a)         Value of Benefit

4          Wood asserts that on the date she entered DROP, the benefit she received based on her

5  unmarried status was less valuable than the amount she would have been eligible to receive if she

6  had been married.  First, if valued on the date of retirement, this is arguably not the case.  A retired

7  City employee's pension, or "Base Retirement Benefit," is made up of four components: 1) the

8  Unmodified Service Retirement allowance; 2) the Cost of Living Annuity; 3) the annual Cost of

9  Living Adjustment; and 4) the Surviving Spouse Annuity if selected by the Member.  *See San Diego*

10  *Municipal Code* § 24.0103.  An unmarried retiree's pension consists of all these components, if he

11  or she selects the SSCB annuity option, as did Wood.  A married retiree's pension consists of

12  components 1), 2), and 3).  Therefore, on the date of retirement, a married retiree who has an

13  Unmodified Service Retirement allowance equal to that of his unmarried counterpart receives a

14  pension that is worth less because it does not include the additional Surviving Spouse Annuity.

15  However, according to Wood, the 50% continuance benefit which the married retiree's spouse is

16  potentially eligible to receive sometime in the future is more valuable.  This assertion is based on

17  pure conjecture.

18          As the Ninth Circuit recently explained, if a claim "rests upon contingent future events that

19  may not occur as anticipated, or indeed may not occur at all. . .the plaintiff likely will not have

20  suffered an injury that is concrete and particularized enough to establish the first element of

21  standing."  *Bova v. City of Medford*, 564 F.3d 1093, 1096 (9th Cir. 2009) (internal citations omitted).

22  In *Bova*, two city employees challenged the city's practice of not providing health insurance to

23  retired employees.  *Id*. at 1094.  The Ninth Circuit found that the possibility that health insurance

24  would not be extended to the plaintiffs at some future time was not an injury sufficiently concrete or

25  particularized, given that it was contingent on two intervening events, namely the plaintiffs'

26  retirement and the city's decision not to extend health insurance to them.  *Id.* at 1096-97.  As a

27  result, the Ninth Circuit held that the plaintiffs' federal claims should have been dismissed.

28  ///

1         Similar to the *Bova* case, Wood's claim rests upon a series of contingencies.  Wood alleges

2 she suffered an actual economic injury on the date she retired because she received a less valuable

3 benefit than her married (and predominately male) counterparts.  However, on the date of retirement,

4 the value of Wood's benefit if she had been married was arguably zero, as on that date married

5 retirees receive no monetary payout from the system.  It certainly was not *more* valuable on that date

6 than what she received as an unmarried retiree.  If Wood had retired married, the value of her benefit

7 under the SSCB would have been unknown on the date of retirement because that value was

8 contingent upon a series of events: pre-deceasing her spouse, her spouse surviving her for a period

9 of years, and her spouse's eligibility for the benefit at the time of her death.

10         Furthermore, Wood's allegation that unmarried retirees, as a group, receive a substitute

11 benefit worth approximately $1.498 million annually less that their married counterparts, does not

12 assist her effort to establish standing.  First, like Wood's alleged injury, this figure is the result of

13 pure speculation.  Wood offers the declaration of former City Treasurer Connie Jamison to support

14 the allegation of economic injury to the class of unmarried retirees.  In her declaration Jamison cites

15 to data contained in an attachment to a June 5, 2001 SDCERS Staff Report from the Legal Services

16 Division, with a subject heading "Proposed Revisions to Division 6 - Optional Settlements and

17 Survivor Benefits."  In that memorandum, a recommendation is made to amend section 24.0601 to

18 provide that unmarried retirees receive the actuarial (versus actual) present value of his or her

19 survivor contributions in lump sum or as an annuity.  Data is attached showing that if this

20 hypothetical amendment were made to the SSCB option, benefits to unmarried retirees would

21 "equal" those of married retirees, at an additional cost to the City of .28 percent of the City's payroll,

22 which as of June 30, 2002, was $535,157,000.  Jamison goes on to conclude that "according to this

23 study, unmarried retirees, as a group, receive approximately $1.498 million less in retirement

24 benefits annually than they would if they were paid benefits equal those of their married

25 counterparts," where $1.498 million is .28 percent of the City's June 2002 payroll.  However, this

26 cost-based conclusion once again relies on a series of contingencies, i.e., a static payroll and an

27 amendment to the municipal code, and does not reflect an *actual* cost to the City, much less a

28 concrete and non-speculative injury to unmarried City retirees.

                                                   03cv1910

1    In addition, although a lead plaintiff can assert claims on behalf of a class of plaintiffs

2 similarly situated, she first must establish standing in her own right. *In re VeriSign*, 2005 U.S. Dist.

3 LEXIS 10439, at \*16-17.  Thus, even if it were accepted as true that unmarried retirees, under a

4 series of contingent conditions, may receive less as a group under the SSCB option than their

5 married counterparts, Wood cannot demonstrate that she as an individual suffered any actual

6 economic injury for the reasons stated above.

7                              b)       Matching Employer Contributions

8    Wood also alleges she suffered pecuniary injury by receiving a refund of only her employee

9 contributions under San Diego Municipal Code section 24.0601(e), whereas married retirees receive

10 a benefit funded also by "substantially equal" matching employer contributions.  In support of this

11 assertion, she cites once again to the declaration of former City Treasurer Connie Jamison, in which

12 Jamison states "at retirement that substitute benefit pays an unmarried City employee a refund only

13 of that employee's payroll contributions, with interest, without the "substantially equal" matching

14 contributions made on the employee's behalf by the City as required by the City Charter." *See*

15 *Jamison Decl'n.* ¶ 10.  It is unclear what portion of the City's contribution Wood believes unmarried

16 retirees do not receive – the City's own matching surviving spouse contribution, or the City's

17 matching normal contributions that fund in part the future 50% surviving spouse continuance

18 benefit.  Either way, Wood fails to demonstrate an actual injury because she does not demonstrate

19 that: 1) the City actually matches the employee's surviving spouse contributions, or, 2) regardless of

20 how the 50% continuance benefit is funded, she has any entitlement to that benefit given her status

21 as a retiree, and not a surviving spouse.

22    First, the applicable regulations do not support Wood's assertion that the City contributes

23 "substantially equal" matching surviving spouse contributions.  A brief review of the City

24 employees' retirement system is required to illustrate this point.

25 ///

26 ///

27 ///

28 ///

03cv1910

1    City employees who retire receive a pension.  The pensions of all City employees are funded

2    in accordance with Article IX, Section 145 of the City Charter of San Diego, which provides, in

3    pertinent part:

4        All moneys contributed by employees of the City or appropriated by the Council or
         received from any other source under the terms of this Article, shall be placed in a
5        special fund in the City Treasury to be known as the City Employees' Retirement
         Fund, which said fund is hereby created.  Such fund shall be a Trust Fund to be held
6        and used only for the purpose of carrying out the provisions of this article.  No
         payments shall be made therefrom except upon the order of the Board of
7        Administration.  This fund may by placed by the Board under the Funds Commission
         for investment; but shall not be merged with other funds of the City.
8
     The pension fund is made up of contributions by 1) employees, and 2) the City.  There are three
9
     classifications of employee contributions: 1) "normal" contributions,[9] 2) "additional"
10
     contributions,[10] and 3) "survivor" contributions.[11]  *See San Diego Municipal Code* §§ 24.0103,
11
     24.0601.  The City "contributes annually an amount substantially equal to that required of the
12
     employees for normal retirement allowances. . .but shall not be required to contribute in excess of
13
     that amount..."  *See City Charter of San Diego*, Art. IX, § 143.  The Charters, Policies, Resolutions
14
     and Rules of the Board of Administration of the City's retirement system, Article II, Division 2,
15
     further delineates the City's obligation to contribute to the pension fund in a "substantially equal"
16
     amount.  Rule 2.100 pertains to  the calculation of the "substantially equal" requirement.  That rule
17
     states, in pertinent part:
18
         Benefits included in the substantially equal determination are:
19

20       1)      The normal cost of any benefits provided as part of the normal
                 retirement allowance of the Member.
21
         2)      Normal cost means the cost necessary to fund benefits that accrue in
22               the current fiscal year.

23       3)      Normal retirement allowance means:

24       ───────────────────

25       [9] Defined in San Diego Municipal Code § 24.0103 as "contributions by a Member at the normal
     rates of contribution, but does not include additional contributions by a Member."

26       [10] Defined in Article IX, Section 143 of the City Charter a contribution that is "more than
     required for normal allowances."
27

28       [11] Defined in San Diego Municipal Code § 24.0601 as "contributions in addition to Normal
     Contributions" calculated "as a percentage of Normal Contributions."

i.      Only those benefits paid in the form of an "allowance" rather than as a lump sum at or upon termination;

ii.     Retirement allowances based on accrued service...;

iii.    Retirement allowances paid for the life of a Member only and not for the life of survivors or beneficiaries...

The rule goes on to state that "any benefits that do not fall within the guidelines" cited above are excluded from the substantially equal determination.

The SSCB option, section 24.0601 of the municipal code, subsection (e), provides:

If, at the time of retirement, a Member who has selected the maximum benefit does not have a spouse who is eligible for benefits under this section, the System will either:

(1)     pay the Member the Accumulated Contributions[12] including interest he or she made pursuant to this section, in *lump sum*, or

(2)     *treat these contributions as voluntary additional contributions* made to provide a larger Annuity benefit.

(emphasis added).  Thus, when the SSCB option is considered in tandem with the Board's rules, the City Charter, and the relevant additional municipal code sections cited above, it appears that the City does not "match" the employees' surviving spouse contributions.  Rather, these contributions are treated as voluntary additional contributions to the employee's annuity.  The City is not required to match additional contributions, nor is it required to match benefits paid in a lump sum.

Furthermore, Wood has not demonstrated any circumstances under which she would have an entitlement to any of the City's matching normal contributions that might eventually fund a future 50% surviving spouse continuance benefit given her status as a retiree, and not a surviving spouse. In light of recent Ninth Circuit law, it appears Wood cannot.  As a City employee, Wood enjoyed a vested right to her pension.  *In re Retirement Cases*, 110 Cal. App. 4th 426, 447 (Cal. App. 1st Dist. 2003).  However, in *Carmona v. Carmona*, 603 F.3d 1041, 1048 (9th Cir. 2010), the Ninth Circuit distinguished the vested rights of a surviving spouse, holding that "surviving spouse benefits irrevocably vest in the *participant's spouse* at the time of the annuity start date – in this case the participant's retirement..." (emphasis added).  Thus, the 50% continuance provided under the SSCB

---

[12] Defined by San Diego Municipal Code § 24.0103 as "Accumulated Normal Contributions plus any Accumulated Additional Contributions standing to the credit of a Member's account."

1  option is a benefit owed only to a surviving spouse, not a retiree, and as a result City employees who

2  are married at the time of retirement receive *no* benefit themselves under the SSCB option, much

3  less a benefit of greater value than that received by unmarried retirees.

4              *iii.    Conclusion*

5        Because Wood cannot demonstrate that she has suffered an actual, concrete injury that is not

6  overly speculative or purely hypothetical, she lacks standing to pursue her federal discrimination

7  claim. The additional two elements of the standing analysis need not be addressed, since all three

8  must be satisfied in order to have constitutional standing; however, redressability is discussed briefly

9  below for the benefit of the parties and any future reviewing court.

10       Even if Wood were able to establish an injury in fact and that her presumed injury is "fairly

11  traceable" to the challenged action in this case, she cannot establish that there is a substantial

12  likelihood that the relief she requests will redress her injury.

13             B)    Redressability

14       In order to having standing under Article III, a plaintiff must show that the injury in fact is

15  able to be redressed by order of the court. Plaintiff seeks money damages in an amount calculated as

16  the difference between the value of her lump sum payment versus the value of the continuing benefit

17  she would have received if married at the time of retirement. This amount was approximated in

18  dollar terms as $77,816.92, based on a variety of assumptions used by her expert Manuel Valdez. In

19  addition to relying on the Valdez declaration to establish injury in fact, Plaintiff also relies on this

20  valuation to support her assertion that she has suffered a redressable injury.

21       Plaintiff also seeks injunctive relief. Specifically, she requests that the Court enter an order

22  requiring the City to pay class members the actuarial equivalent of their survivor contributions.

23  Under Supreme Court and Ninth Circuit law, the Court arguably cannot grant Plaintiff's request for

24  injunctive relief due to its retroactive nature, further demonstrating that her alleged injuries in this

25  case are incapable of redress. In the *Norris* case, the Supreme Court determined that retroactive

26  liability was inappropriate in Title VII pension plan cases. *Arizona Governing Comm. for Tax*

27  *Deferred Annuity and Deferred Compensation Plans v. Norris*, 463 U.S. 1073, 1105-1107 (1983).

28  "An order to adjust future annuity payments to female retirees to reach equality with payments to

1  similarly situated men [is] fundamentally retroactive in nature." *Id.* at 1105, n. 10.  The Supreme

2  Court confirmed this in *Florida v. Long*, 487 U.S. 233, 236 (1988), stating that: "Retroactive

3  awards, applied to every employer-operated pension plan that did not anticipate our decision, would

4  impose financial costs that would threaten the security of both the funds and their beneficiaries."

5  (citing *Norris* opinion).  The court went on to hold that:

> 6  It is essentially retroactive to disrupt past pension funding assumptions by requiring further
> adjustments based on conduct that could not reasonably have been considered violative of
> 7  Title VII at the time retirements occurred and funding provisions were made. Respondents
> "could not have done anything after [Norris] to eliminate [the resulting disparity in the
> 8  pension fund] short of expending state funds." *Norris*, supra, at 1095 (MARSHALL, J.,
> concurring in judgment in part).  Under the Florida plan, no adjustment in benefits payments
> 9  is required for employees who retired before the effective date of our decision in *Norris*. As
> the class here consists only of employees who retired before *Norris*, it is not entitled to the
> 10  relief ordered by the District Court.

11  *Florida v. Long*, 487 U.S. 223, 240 (1988).  Other courts have followed this rule.  *Ridge v. State*

12  *Employees' Retirement Bd.*, 690 A.2d 1312, 1997 Pa. Commw. LEXIS 148, 71 Empl. Prac. Dec.

13  (CCH) P44868 (Pa. Commw. Ct. 1997); *United States EEOC v. First Nat'l Bank*, 740 F. Supp. 1338

14  (1990).

15  Here, if the Court were to grant Wood and the class she represents the injunctive relief

16  requested, it would abrogate the theory enunciated by the Supreme Court in *Norris, Florida*, and

17  their progeny by requiring the City to disrupt past pension funding by requiring payouts based on the

18  promulgation of an ordinance that arguably could not reasonably have been considered violative of

19  Title VII due to its gender neutrality.  Furthermore, Wood, as a retiree at the time she filed suit, is

20  not entitled personally to benefit from any such retroactive relief.  Thus, Wood lacks standing to

21  pursue her federal discrimination claim not only because she cannot demonstrate she suffered actual

22  injury, but also because she cannot show her alleged injuries are able to be redressed by this Court,

23  either by way of a retroactive payment or injunctive relief.

24  ### 3. *Conclusion*

25  To satisfy Article III's standing limitations, a plaintiff must demonstrate that: (1) he or she

26  has suffered an "'injury in fact' –  an invasion of a legally protected interest which is (a) concrete

27  and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) there is a causal

28  connection between the injury and the conduct complained of –  the injury is "fairly traceable" to the

1   challenged action of Defendants, and not the result of the independent action of some third party not

2   before the court; and (3) it is "likely," as opposed to merely "speculative," that the injury will be

3   redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561

4   (1992) (citations omitted).  For the reasons stated above, the Court finds that Wood lacks

5   constitutional standing sufficient to state a case or controversy within this Court's subject matter

6   jurisdiction because she has not suffered an "injury in fact" that is neither "conjectural or

7   hypothetical," and any such injury, even if it was determined to be legally cognizable, would be

8   incapable of redress.  Accordingly, the Court **GRANTS** the City's motion to dismiss Plaintiff's

9   federal discrimination claim due to Plaintiff's lack of Article III standing.

10                                          **STATE LAW CLAIMS**

11          A district court may decline to exercise supplemental jurisdiction over state law claims if the

12   court has dismissed all claims over which it has original jurisdiction.  28 U.S.C. § 1367(c)(3).  When

13   determining whether to exercise supplemental jurisdiction, the district court is informed by the

14   "underlying objectives . . . of [judicial] economy, convenience, fairness, and comity." *Executive*

15   *Software North America, Inc. v. U.S. Dist. Court for the Cent. Dist. of California*, 24 F.3d 1545,

16   1557 (9th Cir. 1994).  "'In the usual case in which all federal law claims are eliminated before trial,

17   the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining

18   state law claims.'" *Acri v. Varian Assoc., Inc*., 114 F.3d 999, 1001 (9th Cir. 1997) (quoting

19   *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)).  Pursuant to section 1367(c)(3), the

20   district court is not required to articulate on the record the specific reasons for declining to exercise

21   jurisdiction. *San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 478-79 (9th Cir. 1998).

22   Accordingly, in the exercise of its discretion under 28 U.S.C. § 1367(c)(3), this Court declines to

23   assert jurisdiction over Wood's supplemental state law claims.

24   ///

25   ///

26   ///

27   ///

28   ///

03cv1910

<u>CONCLUSION</u>

Based on the foregoing, the Court **GRANTS** Defendant City of San Diego's Motion to Dismiss Due to Lack of Standing and **DISMISSES WITH PREJUDICE** Plaintiff Janet Wood's federal disparate impact discrimination claim and **DISMISSES WITHOUT PREJUDICE** her supplemental state law claims.[13]  This order disposes of all remaining claims.  Accordingly, the Clerk of Court is instructed to enter judgment in favor of Defendant City of San Diego and terminate this case.

**IT IS SO ORDERED**.

DATED:  November 22, 2010

Hon. Michael M. Anello
United States District Judge

---

[13] The Court previously dismissed with prejudice Plaintiff's federal disparate treatment discrimination claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See June 10, 2010 Order Granting In Part and Denying In Part Defendant's Motion to Dismiss Plaintiff's First Amended Class Action Complaint*, Doc. No. 138.